IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BRAL CORPORATION, | ) |
| Plaintiff/Counterclaim Defendant, | ) ) ) ) |
| v. | ) ) ) |
| JOHNSTOWN AMERICA CORPORATION, | ) CIVIL ACTION NO. 3:08-232 ) JUDGE KIM R. GIBSON |
| Defendant/Counterclaimant, | ) ) ) |
| v. | ) ) ) |
| KEITH DUNBAR *and* CHRISTOPHER CHEN, | ) ) ) |
| Counterclaim Defendants. | ) |

## MEMORANDUM AND ORDER OF COURT

### I. SYNOPSIS

This matter comes before the Court on the Motion for Summary Judgment (Doc. No. 109) filed by Defendant Johnstown America Corporation ("JAC"). Plaintiff Bral Corporation ("Bral") opposes the motion. (Doc. No. 125). For the reasons that follow, the Court will **DENY** Defendant's motion.

### II. JURISDICTION AND VENUE

The Court has jurisdiction pursuant to 28 U.S.C. § 1332(a). Venue is proper under 28 U.S.C. § 1391(a)(2).

### III. BACKGROUND

This case arises from a contractual dispute between Bral, an Ohio-based importer of metal products utilized in the railroad industry, and JAC, a manufacturer of coal-carrying

1

railroad cars and Delaware corporation with its principal place of business in Johnstown, Pennsylvania. (See Doc. No. 111 at 1-2). From the years 1997 to 2003, Bral supplied JAC parts (the "A/F casting parts") on a purchase order basis for the door system of JAC's AutoFlood hopper cars to be used in the manufacture of the door system for each railcar. (Id. at 1-2). In manufacturing the door system for each railcar, JAC used 120 A/F casting parts per car. (Id. at 2). All casting parts supplied by Bral to JAC were manufactured at a Chinese foundry known as Ningbo Daming Precision Casting Co., Ltd. ("Daming"). (Id. at 3). From May 2000 to May 2004, JAC's production requirements ranged from five to ten car sets of parts per business day. (Id. at 2). In October 2003, CMN Components ("CMN")—an Illinois corporation that was also engaged in the business of importation and machining of metal products used in the railroad industry—offered to supply JAC with A/F casting parts at prices lower than those charged by Bral. (Id. at 3). In February 2004, JAC submitted a purchase order to CMN for 140 car sets of A/F casting parts. (Id.). JAC would eventually cancel this purchase order and begin contract negotiations with Bral that would eventually lead to the culmination of the contract (the "Supply Agreement") at issue here. (Id. at 4). The Supply Agreement was concluded and went into force in May 2004. (Id.). As evidenced by the parties' filings in the instant motion—especially their Concise Statements of Material Fact ("CSMF")—the parties dispute the negotiation circumstances behind several of the operative clauses of the Supply Agreement.[1] (See Doc. Nos. 110 at 4; 111 at 5-6; 126 at 3-4). The parties do agree, however, that Bral prepared the initial draft of the Supply Agreement and that JAC's requirements for A/F casting parts immediately prior to the Supply Agreement negotiations stood at six car sets per business day. (See Doc. Nos. 110 at 4; 111 at 2, 5; 126 at 2, 3).

---

[1] This includes disputes as to various iterations of Section 11 and Section 18.

After the parties entered into the Supply Agreement, JAC encountered an unprecedented increase in orders for AutoFlood hopper cars. (See Doc. No. 111 at 8). Through 2005 and 2006, JAC's manufacturing requirements shot up from six car sets per day to between twenty-two and forty-three car sets per day. (Id. at 9). The parties later signed an amendment ("Second Amendment") to the Supply Agreement that extended the term of the agreement through December 2007. (Id. at 9). Between May 1, 2004 and December 31, 2007, JAC purchased from Bral more than 18,900 car sets of A/F casting parts, which was on average, at least twenty sets per business day. (Id. at 9). During the term of the Supply Agreement, JAC purchased at least 3,900 sets of A/F casting parts from CMN, although the precise number is disputed. (See Doc. Nos. 110 at 5; 111 at 9; 126 at 7).

This action was commenced by Bral in September 2008 and several motions have been decided in this case. The instant motion was filed by JAC in June 2011, and followed by motions for summary judgment by Bral and third party defendants Dunbar and Chen on JAC's counterclaims. (See Doc. Nos. 112, 116, 119). The Court previously issued its memorandum and order (Doc. No. 140) concerning these motions, and indicated it would address JAC's instant motion in a separate memorandum, as it does here. The motion has been fully briefed (See Doc. Nos. 110, 111, 113, 125, 126, 133, 134, 135) and is now ripe for disposition.

### IV. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) states that "a court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" FED. R. CIV. P. 56(a). In the words of the Third Circuit, "[s]ummary judgment is appropriate only where, drawing all reasonable inferences in favor of

the nonmoving party, there is no genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law." *Melrose, Inc. v. Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010) (quoting *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 380 n.6 (3d Cir. 2007)); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); FED. R. CIV. P. 56 (a).[2] Disputes of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); see also *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Material facts are those which will affect the outcome of the trial under governing law. *Anderson*, 477 U.S. at 248.

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets this burden, the party opposing summary judgment "may not rest upon the mere allegations or denials of the . . . pleading," but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (internal citations omitted); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); see also *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (noting that a party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted).

---

[2] Rule 56 was revised in 2010. The standard previously set forth in subsection (c) is now codified as subsection (a). The language of this subsection is unchanged, except for "one word—genuine 'issue' bec[ame] genuine 'dispute.'" FED. R. CIV. P. 56 advisory committee's note, 2010 amend.

4

## V. DISCUSSION

The parties disagree as to whether there was a breach of contract with regard to the Supply Agreement, and if so, what the appropriate form of damages might be. The Court will address each issue in turn.

### a. Bral's Breach of Contract Claim

JAC claims that it is entitled to summary judgment as a matter of law because it did not breach the Supply Agreement when it purchased A/F parts from CMN. It asserts that this argument is supported by two undisputed, underlying facts. First, it claims that "under the terms of the Supply Agreement, [JAC] was only required to purchase its full requirements of A/F casting parts from Bral, up to a limit of twelve railcar sets per business day...." (Doc. No. 110 at 6). Additionally, JAC states that "during the term of the Supply Agreement, [JAC's] purchases from Bral averaged at least twenty railcar sets of A/F casting parts per business day." (Id.). Bral disagrees. It argues that evidence of a breach exists because under the terms of the Supply Agreement, JAC was required to purchase its full A/F casting parts requirements exclusively from Bral, and this agreement was violated by JAC's own admission that it bought at least 3,900 car sets of A/F casting parts from CMN during the period the Supply Agreement was in effect. (See Doc. No. 125). The crux of the disagreement between the parties depends upon the terms of the Supply Agreement. Specifically, did the provisions of the contract create an exclusive supply agreement or was Bral only entitled to a certain purchase quota per day from JAC?

"Pennsylvania law requires that a plaintiff seeking to proceed with a breach of contract action must establish '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'" *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (quoting *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058

5

(Pa. Super. Ct. 1999)). Here, Defendant challenges the existence of a breach by claiming that the duty imposed under the Supply Agreement in purchasing its "full requirements," obligated JAC to purchase up to only twelve A/F car sets of parts per business day if any purchase was made on that particular day. It contends, however, that if its daily purchase requirements were more than twelve sets per any given business day, the Supply Agreement did not bind it to purchase these sets from Bral.[3] When determining an existence of breach premised upon a disagreement by the parties over the terms of the contract, the interpretation of the contract is a matter of law for the Court to decide. See *Prudential Ins. Co. of America v. Prusky*, 473 F. Supp. 2d 629 (E.D. Pa. 2007) (noting that "[i]nterpreting a contract is a question of law and 'the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement.'" (quoting *Currid v. Meeting House Rest., Inc.*, 2005 PA Super 65, 519, *appeal denied* 584 Pa. 694, 882 A.2d 478 (2005)).

### i. Contract interpretation as a matter of law: clear or ambiguous writings

To commence the task of contract interpretation, the Court must start with the language of the contract, which is "[t]he strongest external sign of agreement between contracting parties," and evinces the parties objective manifestations of their intent. *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1009 (3d Cir. 1980). When looking to the words of the contract, the Court must not make any "inference or give any construction to the terms of a written contract that may be in conflict with the clearly expressed language of the written agreement." *Nat'l Cash Register Co. v. Modern Transfer Co., Inc.*, 302 A.2d 486, 488 (Pa. Super. Ct. 1973). Similarly, a court may not "construe a written contract in such a way as to

---

[3] In other words, JAC argues that the Supply Agreement obligated it to purchase from Bral A/F parts for car sets one through twelve on any given business day, but not necessarily those beyond the twelfth set.

6

modify the plain meaning of its words, under the guise of interpretation." *Best v. Realty Mgmt. Corp.*, 101 A.2d 438, 440 (Pa. Super. Ct. 1953). Pennsylvania law, in turn, requires that where "a written contract is clear and unequivocal, its meaning must be determined by its content alone." *East Crossroads Center, Inc. v. Mellon-Stuart Co.*, 205 A.2d 865, 866 (Pa. 1965). Thus, the first step for a court determining how to properly interpret a contract is to assess whether the contract is clear or ambiguous. If the former, then the plain meaning of the words hold and the Court will make a determination as to interpretation as a matter of law; however, if the latter, then extrinsic evidence may be used and the interpretation of an ambiguous writing will be left for determination by the fact-finder. See *Bethlehem Steel Corp. v. U.S.*, 270 F.3d 135, 139 (3d Cir. 2001); *Marcinak v. Southeastern Greene School Dist.*, 544 A.2d 1025, 1027 (Pa. Super. Ct. 1988); *Pac. Employers Ins. Co. v. Global Reinsurance Corp. of Am.*, 693 F.3d 417, 426 (3d Cir. 2012).

Determining whether the contract is clear or ambiguous does not mean that a court "simply determine, from our point of view [that] the language is clear," but rather requires the Court to "consider the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation." *Bethlehem Steel*, 270 F.3d at 139 (quoting *Teamsters Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 135 (3d Cir. 1993)) (quotations omitted) (also noting that "[e]xtrinsic evidence may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning."). *Id.* It has been cautioned, however, that "[a] court should not 'torture' the contractual language to create ambiguities where none existed." *Prudential*, 473 F. Supp. 2d at 635. A contract will be found ambiguous,

> if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning

7

through indefiniteness of expression or has a double meaning. A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction.

*Duquense Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 614 (3d Cir. 1995) (internal quotations and citations omitted). Thus, it has been said that "[a] contract is ambiguous only if it is written so imperfectly that it is susceptible to more than one reasonable interpretation."[4] *Pacific Employers*, 693 F.3d at 426 (internal citations omitted) (citing *Brad H. v. City of New York*, 17 N.Y.3d 180); see also *Metzger v. Clifford Realty Corp.*, 47 A.2d 1, 5 (Pa. Super. Ct. 1984). The process of looking at the entire contract and the words used therein—in light of the parties' proposed meanings, circumstances, and facts—seeks to ascertain whether "any variation of the words would be an impermissible rewriting of the contract." *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1016 n.13 (3d Cir. 1980).

### ii. The Supply Agreement is Not Ambiguous

Here, the parties disagree as to the nature of the "full requirements" term as contained within the Supply Agreement. JAC's contention that it did not breach the Supply Agreement rests on its averment that the full purchase requirements term applied only to its "requirements of

---

[4] The Court acknowledges that the preliminary determination of whether the contract is clear or ambiguous might necessitate a further determination if ambiguity is found. Specifically, the subsequent inquiry of whether proffered extrinsic evidence might help determine whether there is a latent ambiguity in the contract could possibly lead to the determination that an ambiguity does indeed exist, and that parol evidence might be applicable to aid the trier of fact in determining the correct interpretation of the disputed term(s). See *Duquense Light Co.*, 66 F.3d at 614 (as this Circuit has noted, the utilization of extrinsic evidence for the purpose of determining the existence of ambiguity "is confined to determining 'the parties' linguistic reference.'") (quoting *Mellon Bank*, 619 F.2d at 1011 n.2). In other words, "[e]xtrinsic evidence to show ambiguity in a contract can only be evidence that addresses the meaning of a specific term in the contract, and not the subjective intent of the parties." *Meyer-Chatfield v. Century Bus. Servicing, Inc.*, 732 F. Supp. 2d 514 (E.D. Pa. 2010) (citing *Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 24 F.3d 79, 93-94 (3d Cir. 2001). Thus, if a reasonable alternative 'semantic reference' exists, then there will be a finding of latent ambiguity. Otherwise, the plain meaning of the contract will trump.

8

A/F casting parts up to twelve complete car sets per business day and that the Supply Agreement did not apply to [JAC's] purchases of A/F casting parts *beyond* twelve car sets per business day." (Doc. No. 110 at 6) (emphasis original). Bral disputes this meaning and argues the Supply Agreement is exclusive in that JAC is obligated to have Bral supply all of its full A/F casting parts purchase requirements.[5]

As discussed above, the determination of whether JAC did not breach the Supply Agreement rests upon whether the terms of the Supply Agreement were clear or ambiguous. Here, the Supply Agreement was entitled "Exclusive Supply Agreement,"[6] and indeed the chapeau of the contract begins with: "This EXCLUSIVE SUPPLY AGREEMENT (this "Agreement") is made as of this 1st day of May, 2004 between JOHNSTOWN AMERICA CORPORATION ... and BRAL CORPORATION...." (Doc. No. 113-1 at 2). It further states that the purpose behind the agreement is that "Bral and Johnstown desire that Bral be the exclusive provider and supplier to Johnstown of certain railroad-related products in accordance with the terms of this Agreement." (Id.). While it would seem clear from this language and the use of capital letters that the contract was to memorialize an exclusive supplier relationship

---

[5] The Court notes the implications of the parties' arguments concerning breach presently before the Court. In its motion for summary judgment, JAC has asked the Court to find that there was no breach because there are no disputed facts as to the terms of the Supply Agreement requiring JAC to purchase at least, but not necessarily more than, twelve A/F casting sets per business day. If the Court finds that JAC has not met its burden of supporting the contention that there was no breach, this means that JAC's motion for summary judgment on this basis must be denied because the parties then dispute the nature of the breach, thus failing to meet the summary judgment standard. A finding that there was no breach on JAC's motion for summary judgment, however does not necessarily mean that there was a breach, because this is not an issue properly before the Court based on the movant's filings. Thus, at the most, the Court can only find that there was no breach, but cannot affirmatively find the existence of a breach, although a finding of no breach potentially may mean there is a breach present under these circumstances.

[6] Although Section 29 of the Supply Agreement reads: "Headings. The headings of the sections are inserted for convenience of references only, and shall not in any way effect the meaning or interpretation of this agreement." (Doc. 113-1 at 7). The Court notes this provision of the Agreement, but still gives effect to the plain meaning of the words used throughout the Supply Agreement so long as there is no ambiguity underlying their use.

9

between Bral and JAC, JAC nonetheless contends that the Court must look to every portion of the Supply Agreement and give effect to each section as part of the whole contract. See *Marcinak*, 544 A.2d at 1027 (finding that "each and every part of [the contract] must be taken into consideration and given effect, if possible, and the intention of the parties must be ascertained from the entire instrument.").

Specifically, JAC argues that two sections in particular indicate the nature of the supply relationship as being one that is not exclusive. Section 1 delineates[7] that "Bral shall be the exclusive and sole provider to Johnstown of those certain AutoFlood II and AutoFlood III castings described on Exhibit A attached hereto ("Exclusive Parts")." (Doc No. 113-1 at 2). The agreement further states that, "Johnstown shall purchase its full requirements of Exclusive Parts during the Term from Bral," but will not be required to purchase a daily minimum of "Exclusive

---

[7] Section 1 of the Supply Agreement provides in full:

1. Exclusive Provider. During the term of this Agreement (the "Term"), Bral shall be the exclusive and sole provider to Johnstown of those certain AutoFlood II and AutoFlood III castings described on Exhibit A attached hereto ("Exclusive Parts"). The Exclusive Parts shall be produced by Bral in accordance with those certain tooling specifications and other information described on Exhibit B attached hereto (the "Specifications"), which Specifications may be modified from time to time by mutual agreement of the parties. Subject to this Section 1, Johnstown shall purchase its full requirements of Exclusive Parts during the Term from Bral; provided, however, that Johnstown is not required hereunder to guaranty purchase of a minimum quantity of Exclusive Parts. Nothing herein shall restrict or limit Johnstown's right, during the Term, to purchase railcar parts and components, other than Exclusive Parts, from any other manufacturer or supplier.

From time to time, Johnstown shall provide to Bral a written purchase order, indicating the quantity of Exclusive Parts being ordered and stating the state when such Exclusive Parts are due for delivery, which date shall be at least ninety (90) days in advance. Upon receipt of such purchase order, Bral will promptly (which shall in no event be more than three (3) business days from receipt of Johnstown's purchase order) provide written confirmation to Johnstown of the purchase order. If Bral fails to provide such confirmation or is otherwise unable to provide the requested Exclusive Parts in accordance with the purchase order, Johnstown may procure such Exclusive Parts from other suppliers of Exclusive Parts, and such procurement by Johnstown shall not be a breach by Johnstown of this Agreement.

(Doc. No. 113-1 at 2).

10

Parts" from Bral, nor will the contract restrict it from purchasing non-exclusive railcar parts from other sellers.

Despite what would otherwise seem unambiguous terminology as to the existence of an exclusive supply agreement, JAC contends that Section 1 must be read in conjunction with Section 11. In Section 11[8], the parties agreed to have Bral reserve a daily production capacity with the Daming foundry. Specifically, this provision provides that "Bral has reserved production capacity at Daming's facilities to guarantee the production of Exclusive Parts in quantities of twelve (12) complete railcar sets ... per business day," and that "[p]roduction requirements in excess of twelve (12) complete railcar sets per day are subject to negotiation between the parties ...." (Doc. No. 113-1 at 4). JAC contends that this provision, when seen in context of the entire Supply Agreement, limits the full purchase requirements found in Section 1. It argues that Section 11 ensures that if JAC needed to purchase more than twelve sets per business day, then the Supply Agreement would not apply. Under this meaning, it claims it did not breach the Supply Agreement when it bought parts from CMN because it had already fulfilled its daily full purchase requirement from Bral. Plaintiff disagrees and contends that Section 11 does not apply to JAC's purchase obligations, but rather is quite unambiguous in applying to the reserve production capacity requirements. The Court agrees with this latter assessment.

---

[8] Section 11 of the Supply Agreement provides in full:
   11. Production Capacity. Bral has reserved production capacity at Daming's manufacturing facilities to guarantee the production of Exclusive Parts in quantities of twelve (12) complete railcar sets of AutoFlood II or III castings per business day, which Exclusive Parts shall be retained by Bral for sale to Johnstown under this Agreement. Production requirements in excess of twelve (12) complete railcar sets per day are subject to negotiation between the parties, which requirements shall be set forth in a written agreement of the parties.
(Doc. No. 113-1 at 4).

11

For the following reasons, the Court finds that the "full requirement" term of the Supply Agreement is unambiguous in meaning that JAC was obligated to purchase all of its A/F casting parts requirements exclusively from Bral for the term of the agreement. While it is true that the terms of Section 11 should be given effect as part of the whole agreement, the Court does not find persuasive Defendant's argument that the *production capacity* requirements of Section 11 somehow limit its *purchase obligations* of Section 1. Section 11 is clear on its face in distinguishing "purchase" from "production." Indeed, the word "purchase" does not appear once in Section 11. The import of this section—separated by 10 sections of other agreement terms[9] from the section dealing with purchase obligations—plainly concerns the issue of guaranteeing a minimum amount of sets that would be produced at the Daming foundry and set aside by Bral for JAC. The words used in Section 11 clearly point to an agreement between the parties concerning production capacity. Perhaps most importantly, JAC's claim regarding the twelve set threshold in Section 11 never uses language of "purchase requirements," but only "production capacity": "Production Requirements in excess of twelve (12) complete railcar sets per day are subject to negotiation ...." (Doc. No. 113-1 at 4).

The Court believes that had the parties agreed to the contention that JAC would be free to choose an alternate supplier after completing daily purchases of twelve sets from Bral, then it would have used the same purchase requirement language found in Section 1. Such terminology include "purchase," "full requirements," "provider," and "Exclusive Parts." Even further, the Court believes that had the parties agreed to JAC's purported meaning of "full requirements," then it would have included this provision of the contract either in Section 1 or immediately following it. This would seem a reasonable and logical accompaniment to the only other

---

[9] Including sections concerning issues of forecasting, inventory, prices, terms of payment, shipping, delivery, tariffs, risk of loss, and inspection.

12

purchase option present in the Supply Agreement. At the end of Section 1 of the Supply Agreement, the parties agreed that in the event that Bral does not confirm a purchase order "or is unable otherwise to provide the requested Exclusive Parts," then JAC would be permitted to purchase the Exclusive Parts from an alternate supplier without being held to have breached the Supply Agreement. (Doc. No. 113-1 at 2).

Thus, it would seem that the Supply Agreement is not so indefinite such that alternate reasonable meanings might exist concerning JAC's "full requirement" purchase obligations.[10] To allow JAC's assertion that Section 11's production capacity requirements were meant to condition the purchase requirements of Section 1 would be an "impermissible rewriting of the contract." *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1016 n.13 (3d Cir. 1980). For these reasons, therefore, the Court cannot find that JAC's purchase obligations from Bral were limited to twelve A/F car sets per day at the most, and nothing *beyond* that. Thus, the Court finds that JAC is not entitled to a determination on its motion for summary judgment that it did not breach the Supply Agreement under the basis that it was required to purchase only up to twelve car sets per day.

### b. Damages

#### i. Liquidated Damages

Defendant also contends that in the event the Court does not find summary judgment in its favor on there being no breach of the Supply Agreement, then the Court must find that Bral is precluded from recovering liquidated damages under Section 18 of the Supply Agreement. Bral disagrees and claims that the liquidated damages clause is valid and does not act as a penalty

---

[10] The Court notes that in finding the intent of the parties being clearly and unambiguously represented through the words of the Supply Agreement, and thus a determination of ambiguity not warranted, it would have nonetheless found JAC's assertions concerning its meaning based on its proffered extrinsic evidence unpersuasive had the Court found some form of ambiguity present.

13

against Defendant. For the reasons that follow, the Court will deny Defendant's motion for summary judgment on this basis.

Specifically, JAC argues that the liquidated damages clause in the Supply Agreement is not enforceable because actual damages are calculable, the liquidated damages are not reasonable, and are void because they serve as a penalty. "[C]ontracting parties may provide for pre-determined liquidated damages in the event one party fails to perform, particularly in circumstances where actual damages would be difficult to estimate in advance or to prove after a breach occurs." *Pantuso Motors, Inc. v. Corestates Bank, N.A.*, 798 A.2d 1277, 1282 (Pa. 2002) (citing Restatement (Second) of Contracts § 356(1) (1981)). However, "[a] term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty." *Id.* Liquidated damages "clauses are enforceable provided, at the time the parties enter into the contract, the sum agreed to is a reasonable approximation of the expected loss rather than an unlawful penalty." *A.G. Cullen Const., Inc. v. State Sys. of Higher Educ.*, 898 A.2d 1145 (Pa. Commw. Ct. 2006). For liquidated damages,

> the question ... is to be determined by the intention of the parties, drawn from the words of the whole contract, examined in the light of its subject matter and its surroundings; and that in this examination we must consider the relation which the sum stipulated bears to the extent of the injury which may be caused by the several breaches provided against, the case or difficulty of measuring a breach of damages, and such other matters as are legally or necessarily inherent in the transaction.

*Com. v. Musser Forests, Inc.*, 146 A.2d 714, 717 (Pa. 1958) (quoting *March v. Allabough*, 103 Pa. 335, 341 (Pa. 1883)). "[T]he question whether a sum stipulated for in a written contract is a penalty or liquidated damages is a question for the court, to be determined by the intention of the parties, examined in the light of its subject-matter and its surroundings." *Laughlin v. Baltalden, Inc.*, 159 A.2d 26, 29 (Pa. Super. Ct. 1960).

14

Defendant first contends the liquidated damages clause is unenforceable because it is undisputed that Bral can calculate the exact damages it allegedly suffered if a breach of the Supply Agreement is ultimately established. The Court disagrees with this assessment. Specifically, Defendant misconstrues the timing of when actual damages are calculable to determine the validity of a liquidated damages clause. As noted above, "[l]iquidated damages clauses are enforceable provided that, at the time the parties enter into the contract, the sum agreed to constitutes a reasonable approximation of the expected loss rather than an unlawful penalty." *Perry v. H & R Block Eastern Enterprises, Inc.*, CIV. A. 04-6108, 2009 WL 2581708 *3 (E.D. Pa. Aug. 18, 2009). Here, JAC argues that if Bral ultimately establishes its breach of contract claim, then they will be able to calculate the exact amount of damages suffered, and because of this present ability to quantify actual damages, liquidated damages are unavailable. To be clear, JAC is not claiming that actual damages were calculable at the time of entering into the Supply Agreement. Rather, it argues damages are definitively calculable now. The appropriate point in time, however, for determining whether damages were calculable for validity purposes is at time of entry into the contract. All JAC contends here is that Bral can now measure its damages if it establishes a breach.[11] Thus, JAC is unable to carry its burden of persuasion, as articulated above, for striking the liquidated damages clause on this basis.

Neither does this Court find convincing JAC's remaining argument that the liquidated damages clause should be considered void because it serves as a penalty. If Section 18 served not as a reasonable forecast of anticipated damages, but rather solely as a penalty to discourage breach, then the Court must find it unenforceable on grounds of public policy. See *Hanrahan v. Audobon Builders, Inc.*, 614 A.2d 748 (Pa. Super. Ct. 1992); see also, *Holt's Cigar Company v.*

---

[11] Also, in light of the Supply Agreement's reciprocal liquidated damages terms in the event that Bral commits a breach, the Court notes that the amounts stipulated bore a reasonable relation to the damages reasonably anticipated.

15

*222 Liberty Associates*, 591 A.2d 743 (Pa. Super. Ct. 1991). JAC contends that Section 18 specifically served as an "improper threat" to discourage breach. Defendant points to evidence of "a long campaign by Bral and Dunbar to prevent Johnstown [JAC] from purchasing parts from CMN," which was evidenced in Dunbar's deposition, whereby he admitted that "his intent in including the liquidated damages provision was that 'there would be consequences,' if Johnstown breached the contract." (Doc. No. 110 at 15).

The Court finds this argument unconvincing. Even considering Dunbar's deposition aside from the objective manifestations of the parties' intent, the larger context of his testimony in which JAC bases its argument would point to a dispute as to whether the liquidated damages clause was included for purposes solely of penalizing each party in the event of a breach. Specifically, Dunbar specified the purpose for having the clause "in case there was a violation of the contract," and that he thought "the liquidated damages clause was in there in case either side were to violate the contract, there would be consequences for that." (Doc. No. 113-7 at 4). More importantly, though, when asked what his intention was for the specific amounts used per car ($1000) if breach by JAC occurred, he responded that he did "not know that [he] had an intention ...." (Id. at 5).

Dunbar's statements do not necessarily present a clear-cut picture of the use of liquidated damages solely as a penalty in the case of breach, as JAC contends. If anything, Dunbar's testimony and the disputed nature of the "campaign by Bral and Dunbar" to hinder JAC's relationship with CMN would seem to suggest that liquidated damages, as contemplated as a remedy for each party in the case of breach, was used for the purpose of providing some form of reasonable monetary recourse in the face of uncertain estimations at the time of entry into force of the contract. Under this analysis, the Court is unable to find that Section 18 of the Supply

Agreement serves as an impermissible liquidated damages clause. Thus, for these reasons, the Court denies Defendant's request that Bral be precluded from recovering liquidated damages in the event a breach by JAC is found.[12]

### ii. "Price Differential" Damages

Lastly, JAC contends that in the event the Court does not dismiss Bral's breach of contract claim, then JAC is entitled to summary judgment on the issue that Bral is precluded from recovering "price differential" damages. (Doc. No. 110 at 16-17). Rather than engage in a lengthy discussion of the merits of the parties arguments,[13] the Court notes that the determination of whether Bral would be entitled to "price differential" damages, or reliance damages as referred to by Plaintiff, is premature at the Summary Judgment stage. See *Schmidt, Long & Assoc., Inc. v. Aetna U.S. Healthcare, Inc.*, CIV. A. 00-cv-3683, 2001 WL 856946 (E.D. Pa. July 26, 2001) ("[i]f the uncertainty concerns only the amount of damages, summary judgment is inappropriate."). This is especially so in light of the fact that there has been no conclusive determination here that there is indeed a breach of the Supply Agreement. For this reason, the Court will deny Defendant's final argument in its motion for summary judgment that the "price differential" damages be found unrecoverable by Bral.

---

[12] The Court also notes that any decision concerning damages at this point in time would be premature because the Court has only found here that it will not grant JAC's motion for summary judgment on the basis that there was no breach of the Supply Agreement. In other words, the Court is not making a finding here that there was a breach. Rather, it has only found that, for summary judgment purposes, JAC has not established an absence of breach. Because the Court has not found the existence of a breach on the basis of this motion, it believes a determination as to damages would also be premature at this stage.

[13] In addition to the disputes of fact underlying this argument.

17

## VI. CONCLUSION

As explained in this Memorandum, the Court has not found Defendant's arguments persuasive to the point where it could find that there was no breach by JAC of the Supply Agreement. But in finding this, neither has the Court determined that there was indeed a breach of the Supply Agreement. Similarly, the Court notes that a factual determination underpinning the issue of the types and amounts of damages to which the non-breaching party is entitled would be premature at this stage.[14] Thus, for the foregoing reasons, the Court **DENIES** Defendant's Motion for Summary Judgment. An appropriate order follows.

---

[14] Although the Court engaged in a determination as to Defendant's argument regarding the liquidated damages clause, it notes that the validity of that clause is a legal issue to which the Court was entitled to make a decision at this stage. The Court also notes that in no way has it made any specific findings as to whether the liquidated damages clause applies in this case, but merely that it is not invalid. A determination of its application is a further issue that must be decided when, and if, a determination as to the existence of a breach is affirmatively confirmed.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BRAL CORPORATION, ) | |
| ) | |
| Plaintiff/Counterclaim Defendant, ) | |
| ) | |
| v. ) | |
| ) | |
| JOHNSTOWN AMERICA CORPORATION, ) | CIVIL ACTION NO. 3:08-232 |
| ) | JUDGE KIM R. GIBSON |
| Defendant/Counterclaimant, ) | |
| ) | |
| v. ) | |
| ) | |
| KEITH DUNBAR *and* CHRISTOPHER CHEN, ) | |
| ) | |
| Counterclaim Defendants. ) | |

## ORDER

**AND NOW**, this 30th day of January, 2013, this matter coming before the Court on the Motion for Summary Judgment (Doc. No. 109) filed by Johnstown America Corporation pursuant to FED. R. CIV. P. 56, and opposition to the motion (Doc. No. 125), **IT IS HEREBY ORDERED** that the motion for summary judgment by Defendant is **DENIED**.

BY THE COURT:

*/s/ Kim R. Gibson*

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**